**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| CHRISTOPHER TYSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-1450 (RC) |
| | : | | |
| v. | : | Re Document No.: | 30 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT
AND DENYING DEFENDANT MYRICK'S ALTERNATIVE MOTION FOR RECONSIDERATION OF THE
DENIAL OF HER MOTION TO DISMISS

**I.  INTRODUCTION**

Plaintiff, Christopher Tyson, has brought suit against Defendants the District of

Columbia ("the District") and Jeannette Myrick[1] based on his alleged overdetention in the D.C.

Jail.  This Court previously granted the District's motion to dismiss Tyson's claims under 42

U.S.C. § 1983 but granted him leave to file an amended complaint.  *Tyson v. District of*

*Columbia*, No. 20-cv-1450, at 16 (D.D.C. Mar. 8, 2021) ("Mem. Op.") (ECF No. 27).  That

decision also denied Defendant Myrick's motion to dismiss the common law tort claims of false

imprisonment and negligence against her.  *Id.* at 5, 7.  Tyson subsequently filed an amended

complaint.  2d Am. Compl., ECF No. 29.  The District now moves to dismiss Tyson's claim for

municipal liability under § 1983 for failure to state a claim, and Defendant Myrick again moves

to dismiss the common law claims against her as well as alternatively moving for reconsideration

---

[1] The First Amended Complaint also asserted claims against Lennard Johnson, Warden of the D.C. Jail, which were dismissed in this Court's prior opinion. *Tyson v. District of Columbia*, No. 20-cv-1450, at 7, 9 (D.D.C. Mar. 8, 2021) (ECF No. 27).

of the previous denial of her motion to dismiss.  Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No.

30.  The Court finds that Tyson has plausibly alleged sufficient facts to state a claim of false

imprisonment (Count 1), negligence (Count 2), and municipal liability under 42 U.S.C. § 1983

(Count 3); and will therefore deny Defendants' Motion in its entirety.

## II.  FACTUAL BACKGROUND[2]

On March 22, 2019, Tyson was sentenced by Judge Demeo of the D.C. Superior Court to

serve six months of incarceration with credit for time served.  2d Am. Compl. ¶¶ 20–22; *see also*

Ex. 1 of Defs.' Mot. (copy of sentencing order).  Judge Demeo's sentencing order directed that at

the conclusion of his sentence of incarceration, Tyson should be transferred to the custody of the

Court Services and Offender Supervision Agency (CSOSA) for inpatient treatment at the

Reentry and Sanctions Center (RSC).  2d Am. Compl. ¶¶ 22–24.

The RSC is a residential treatment facility that "provides interventions for defendants

with mental health and substance abuse disorders" and has capacity for just over 100 individuals

at any given time.  *Id.* ¶¶ 10–12.  Tyson's Second Amended Complaint alleges that D.C.

Superior Court Judges often include inpatient treatment at the RSC as a condition of probation or

pre-trial release, but that the RSC's limited capacity has resulted in a backlog of defendants in

the D.C. Jail who are awaiting that treatment.  *Id.* ¶¶ 13–17.  The thrust of Tyson's complaint is

that the District has chosen to respond to this alleged bottleneck by unconstitutionally extending

the time that individuals, including himself, remain detained in the District's custody while

awaiting a spot in RSC.  *Id.* ¶ 18.

Tyson's own sentence of incarceration was supposed to end on or about April 29, 2019.

*Id.* ¶ 21.  The District of Columbia Department of Corrections ("DOC") reached out to CSOSA

---

[2] All facts are drawn from Tyson's Second Amended Complaint.

on April 24, 2019 to schedule Tyson's pickup and transfer to RSC, letting CSOSA know that Tyson's sentence would expire on April 30, 2019. *Id.* ¶ 25. DOC reached out to CSOSA a second time to schedule Tyson's transfer on April 26, 2019 and a third time on May 1, 2019, with the final email advising that Tyson's sentence had expired. *Id.* ¶¶ 26–27. CSOSA responded on May 6, 2019, in a Memo addressed to Defendant Myrick, scheduling Tyson's pickup for May 15. *Id.* ¶ 29. Two days later, CSOSA rescheduled Tyson's pick up for May 23 in another memo addressed to Myrick. *Id.* ¶ 30. Tyson was finally released to CSOSA on May 23, 2019, twenty-four days after the expiration of his sentence of incarceration. *Id.* ¶¶ 32, 35.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Brewer v. District of Columbia*, 891 F. Supp. 2d 126, 130 (D.D.C. 2012). When reviewing a motion to dismiss, a court should presume that the complaint's factual allegations are true and construe them liberally in the plaintiff's favor. *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Nevertheless, the complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Id.* at 678. A

court need not accept a plaintiff's legal conclusions as true, *id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *Twombly*, 550 U.S. at 555.

### 2.  Motion for Reconsideration

A court may reconsider any interlocutory order under Rule 54(b) "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (internal quotations omitted), but "[i]n this District, that abstract phrase is interpreted narrowly." *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, No. 20-mc-00008, 2021 WL 1909777, at *5 (D.D.C. May 12, 2021) (internal quotations omitted).  Reconsideration may be appropriate "when a court has 'patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred.'" *Ali v. Carnegie Inst. of Washington*, 309 F.R.D. 77, 80 (D.D.C. 2015) (*quoting U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012)).  The court's discretion under Rule 54(b) is constrained by the principle that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (citations omitted).  The burden is on the moving party "to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied." *Westrick*, 893 F. Supp. 2d at 268.

### B.  Common Law Tort Claims Against Myrick

As an initial matter, the Court notes that Defendant Myrick appears to be requesting anew that the common law tort claims against her be dismissed under Rule 12(b)(6), as well as requesting in the alternative that this Court reconsider its prior decision.  *See* Defs.' Mot. at 1 ("Defendants District of Columbia… *and Jeanette Myrick* move this Court, *under Fed. R. Civ. P.*

*12(b)(6)*, for dismissal of all claims asserted against *them*.") (emphasis added).  The sufficiency of the common law claims against Myrick was fully briefed and decided in this Court's prior opinion and the substance of those allegations has not significantly changed since then.  Thus, Myrick is barred from raising them in a subsequent Rule 12(b) motion under the consolidation principles of Rule 12(g)(2).[3]  *See* Fed. R. Civ. P. 12(g)(2); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 321 (3d Cir. 2015) ("The procedural bar of Rule 12(g)(2)… covers all motions to dismiss for failure to state a claim, regardless of the grounds asserted.").  Any additional arguments Myrick raises were available to her when she filed her first motion.  *See Candido v. District of Columbia*, 242 F.R.D. 151, 161 (D.D.C. 2007) (allowing a second 12(b)(6) motion where the new argument was not available at the time of the first motion).

Given that Myrick's instant motion principally rehashes the same unmeritorious arguments as her first, this is not one of the exceptional situations in which a discretionary exception to the waiver requirement of 12(g)(2) is warranted.  *See Campbell-El v. District of Columbia*, 881 F. Supp. 42, 43 (D.D.C. 1995) (entertaining a second 12(b)(6) motion because "[t]his is not a case where the Defendants are repeating arguments on which the Court has already substantively ruled"); *Sierra v. Hayden*, No. CV 16-1804, 2019 WL 3802937, at *7 (D.D.C. Aug. 13, 2019) (noting that while the "plain text" of Rule 12 seemed to bar Plaintiff's complaint, second preliminary motions under 12(b)(6) have been permitted where delay is not a

---

[3] The parties raised the issue of waiver under Rule 12(g)(2) with respect to the District, but not to Myrick. *See* Pl.'s Opp'n Defs.' Mot. Dismiss 2d Am. Compl. ("Pl. Opp'n") at 11, ECF No. 31; Defs.' Reply at 1–2, ECF No. 32.  The District prevailed on its prior motion and has been brought back into this litigation by an Amended Complaint that significantly modifies the allegations against it, and is therefore permitted to raise any new arguments in its defense. *See Burton v. Ghosh*, 961 F.3d 960, 967 (7th Cir. 2020) ("[W]hen an amended complaint fundamentally changes the scope or theory of the case, the interests of justice will generally allow a new, relevant affirmative defense to be asserted.").  The same cannot be said for Myrick, who is attempting to engage in piecemeal litigation by her own brief's definition of it. *See* Defs.' Reply at 2 (distinguishing from *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 964-65 (D.C. Cir. 2016), because "the District was dismissed entirely as a defendant" whereas the corporate defendant in *Gilmore* remained in the litigation after their first Rule 12 motion was denied—just like Myrick).

concern and "the Court has not already ruled on this issue").[4]  The Court therefore addresses

Myrick's motion on the common law claims solely as a motion to reconsider.

### 1.  False Imprisonment

Tyson has, in both complaints, pleaded sufficient facts alleging the two elements of a

false imprisonment claim: "(1) the detention or restraint of one against his will, within

boundaries fixed by the defendant[s], and (2) the unlawfulness of the restraint."  *Jones v. District*

*of Columbia*, No. 16-cv-2405, 2019 WL 5690341, at *6 (D.D.C. June 13, 2019) (*quoting Faniel*

*v. Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 150 (D.C. 1979)); Mem. Op. at 6.

Myrick again disputes this second prong, arguing that the restraint was in fact lawful, but

this time attempts to buttress that claim with additional reasoning.[5]  "[M]otions for

reconsideration are not vehicles for either reasserting arguments previously raised and rejected

by the court or presenting arguments that should have been raised previously with the court."

*Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 9 (D.D.C. 2017).  Myrick's assertion

that she had no authority to release Tyson before CSOSA took custody of him is

indistinguishable[6] from her previous argument and fails for the reasons given in the Court's prior

opinion.  And Myrick's new arguments attacking the sufficiency of the "lawfulness" prong fare

---

[4] Although Myrick does not attempt to support her motion this way, the Court also notes that the exceptions in Rule 12(h)(2) are unavailable "because Defendant does not contest subject matter jurisdiction, the pleadings have not yet closed, and the case is not at the trial stage."  *Sierra v. Hayden*, No. 16-cv-1804, at *7.  Although Rule 12(h)(2) allows defendants to raise the defense of failure to state a claim multiple times, subsequent arguments are limited to the postures enumerated by the Rule, which helps ensure orderly adjudication of a case.  *See* Fed. R. Civ. P. 12(h)(2); *Leyse*, 804 F.3d at 321 (explaining why the exceptions in Rule 12(h) should be construed narrowly).

[5] As the Court's prior opinion notes, the legality of the detention is an affirmative defense.  Mem. Op. at 6.  Although "an affirmative defense may be raised… under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint," *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998), a court reviewing a motion to dismiss "draws all inferences in favor of the nonmoving party."  *City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

[6] Myrick adds a list of authorities supporting the proposition that "where a person has been detained by legal process, it cannot be said that such person has been falsely imprisoned."  Defs.' Mot. at 21.  But that otherwise unobjectionable proposition puts the cart in front of the horse because Myrick does not point to any legal process responsible for *extending* Tyson's detention.

no better.  The fact that Myrick "could have made these arguments before but did not is in itself a sufficient basis" to reject them.  *North v. United States Dep't of Just.*, 17 F. Supp. 3d 1, 5 (D.D.C. 2013).  Nevertheless, the Court has considered them and finds them unpersuasive.

Myrick argues any alleged overdetention was lawful because she "never personally took Tyson into custody" and because his initial detention was lawful.  Defs.' Mot. at 21–22.  Both considerations are irrelevant.  "One way to commit false imprisonment is through a refusal to release…. If the actor is under a duty to release the other from confinement[,] his refusal to do so with the intention of confining the other is a sufficient act of confinement to make him subject to liability."  *Jones*, 2019 WL 5690341, at *5 (internal quotations omitted).  And "a detention which is unreasonable in length or manner could constitute a false imprisonment despite the legality of the initial confinement."  *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982).  Tyson plausibly alleges, as he did previously, that Myrick had a duty to either ensure that his detention was supported by legal authority or release him—and did neither.  2d Am. Compl. at ¶ 8.  Myrick also notes in passing that Tyson never requested that Myrick release him, without explaining why that would matter or citing any authority.  Defs.' Mot. at 22.  In any event, Tyson alleges that Myrick was responsible for ensuring that DOC had the authority to detain him whether he personally requested she do so or not.  2d Am. Compl. at ¶ 8.

Myrick's argument that she did not learn of Tyson's confinement until after his sentence had expired also fails.  First, Tyson alleges that Myrick "had at least constructive knowledge" of his overdetention prior to the expiration of his sentence and "had responsibility for checking the sentence calculation and other processes by which Mr. Tyson should have been released."  2d Am. Compl. at ¶ 82.  These allegations, taken as true, support the inference that Myrick may have had personal knowledge of Tyson's overdetention before May 6.  And even if she did not,

the allegation that Myrick personally knew on May 6 that Tyson was being held past his release date, and would continue to be held until CSOSA picked him up the following week, at minimum states a false imprisonment claim for that period.

Finally, Myrick argues that her after-the-fact knowledge "negates any finding of false arrest[7] which requires 'intent.'"  Defs.' Reply at 12.  She cites no authority for this proposition, and it misconstrues the role of intent in false imprisonment.  "[N]either malice nor wrongful intent are controlling considerations in an action for false arrest or false imprisonment."  *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973).  In other words, the fact that Myrick may have believed the overdetention was lawful does not negate her intent in enforcing it.

### 2.   Negligence

To prove negligence in the District of Columbia, a plaintiff must establish "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach."  *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984).  Myrick now reiterates her argument that her alleged actions were not the proximate cause of Tyson's overdetention.  Defs.' Mot. at 23.  Once again, "motions for reconsideration are not vehicles for… reasserting arguments previously raised and rejected by the court . . . ."  *Lovely-Coley*, 255 F. Supp. 3d at 9.  Regardless, the argument lacks merit.

Myrick's position is that if she did not allegedly learn about Tyson's overdetention until after it had been occurring for nearly a week, she could not have caused it.  Defs.' Mot. at 22.  But this mischaracterizes what Tyson has actually pleaded: that Myrick had actual knowledge "no later than" May 6, was in charge of overseeing operations in the Records Office, was

---

[7] Myrick relies primarily on case law from the false *arrest* context, but Tyson has asserted a claim for false *imprisonment*.  "False imprisonment is an umbrella category that includes false arrest," *Jones*, 2019 WL 5690341, at *5.  The distinction makes a difference where a plaintiff alleges an unlawful "refusal to release," as Tyson does here.  *Id.*

responsible for ensuring that inmates are released on the correct date, and even that Myrick maintained a file of overdetention records.  2d. Am. Compl. at ¶¶ 82, 91, 92, 94.  Taken together, Tyson plausibly alleges that Myrick's lack of action to prevent a known problem breached a duty owed him and proximately caused his overdetention.  Indeed, Myrick's position seems to concede that she did in fact know on May 6 that Tyson was being detained past his release date and failed to take any steps to mitigate that harm, despite also knowing that it would last several more weeks.  *See* Defs.' Mot. at 23 ("By the time she learned of the claimed overdetention, arrangements had already been made for pickup.").  Either scenario suggests a breach of duty that plausibly caused Tyson to remain detained in DOC custody.  Disputed issues of fact relating to proximate cause are properly addressed at a later point in the litigation; "[a]t this point, that plausible scenario is all that is needed."  *Wormley v. United States*, 601 F. Supp. 2d 27, 32 (D.D.C. 2009).

### C.  42 U.S.C. § 1983 Claim against DC

42 U.S.C. § 1983 provides a private cause of action against municipalities, such as the District, for the deprivation of a federal constitutional or statutory right.  42 U.S.C. § 1983; *Mitchum v. Foster*, 407 U.S. 225, 239 (1972).  To hold a municipality liable for the constitutionally objectionable actions of its employees under § 1983, a plaintiff must show how that municipality's policy or custom was the "moving force" behind a constitutional violation. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694–95 (1978); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  To survive a motion to dismiss on a § 1983 claim for municipal liability, the plaintiff must allege plausible facts that state a claim: (1) for a predicate constitutional violation, and (2) that the municipality's policy or custom caused the

constitutional violation.  *Baker*, 326 F.3d at 1306.  "Each inquiry is separate and serves different

purposes."  *Id.*  In the Second Amended Complaint, Tyson has satisfied each of those steps.

### 1.  Predicate Constitutional Violation

The first step of the *Baker* test asks whether a plaintiff has alleged a constitutional

violation.  *Id.*  "All that is being established at this stage is that there is some constitutional harm

suffered by the plaintiff, not whether the municipality is liable for that harm."  *Id.*  Tyson alleges

violations of two constitutional rights which the Court will address in turn: substantive due

process and procedural due process.  2d. Am. Compl. at ¶¶ 102, 122.

### a.  Substantive Due Process

"Overdetentions potentially violate the substantive component of the Due Process Clause

by infringing upon an individual's basic liberty interest in being free from incarceration absent a

criminal conviction."  *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 274–75 (D.D.C.

2011).  To show a violation of substantive due process, Tyson must show that he had an interest

protected by the Due Process Clause as well as "demonstrate that the DOC's conduct either

interferes with rights implicit in the concept of ordered liberty or was so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience."  *Id.* at 276–77

(internal quotations omitted).

"Freedom from bodily restraint has always been at the core of the liberty protected by the

Due Process Clause from arbitrary governmental action."  *Foucha v. Louisiana*, 504 U.S. 71, 80

(1992).  But the District argues that because Tyson was to be released to inpatient treatment in

the custody of CSOSA rather than unconditionally, he had no liberty interest at all.[8]  *See* Defs.'

---

[8] The parties also debate in their briefing whether DOC had a statutory obligation to release Tyson at the end of his sentence under D.C. Code § 24-211.02a.  *See* Pl. Opp'n at 12; Defs.' Reply at 3.  This disagreement is irrelevant given that all that is at issue here is the sufficiency of the Second Amended Complaint, and the complaint does not assert a statutory violation claim.

Mot. at 11 ("Because of the expected continued supervision over Tyson through CSOSA, no viable claim can be made that his liberty interests were violated."); Defs.' Reply at 10 ("Tyson enjoyed no liberty interest in being transferred to CSOSA.").  The Court acknowledges that Tyson's liberty interest was distinct from someone who had been unconditionally released, and that difference could potentially support a longer constitutionally permissible delay in releasing Tyson.  *See Barnes*, 793 F. Supp. 2d at 275 ("Courts have declined to adopt a bright-line rule for the maximum permissible delay in the overdetention context.").  But the District's position goes much too far—it cannot be the case that Tyson had no protected interest in avoiding potentially indefinite detention under the custody of the DOC merely because he was subject to supervision by a different agency.[9]

The Court first notes that while restrictive, the nature and purpose of inpatient treatment at RSC differs significantly from ordinary punitive confinement in the D.C. Jail.  As alleged, the RSC is a treatment facility that provides "assessment, counseling, treatment readiness, and referral to treatment facilities" to individuals "who, by using substances, violate the conditions of their release."  2d Am. Compl. ¶¶ 10–11.  That those services have a rehabilitative rather than punitive purpose alone cautions against treating the confinement for inpatient treatment as interchangeable with Tyson's sentence of incarceration.  *Cf. Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."); *Jones*, 2019 WL

---

[9] The District also argues that it cannot be liable for Tyson's alleged overdetention because it was CSOSA that failed to take custody of Tyson.  If anything, this argument cuts against the District's assertion that it could maintain custody over Tyson because he would have been supervised by CSOSA anyhow.  But any potential interference from CSOSA relates to whether the District's policy was the moving force behind the deprivation of that interest and is more properly addressed at a later stage of the litigation.  *See Barnes*, 793 F. Supp. 2d at 285 ("Akin to proximate cause, the question of whether a policy or custom is the moving force behind alleged constitutional deprivations is normally a question for the jury.").

5690341, at *3 ("In assessing which constitutional standards apply to a given confinement,

courts look to its nature and purpose.").[10]

Due process protects a range of liberty interests of varying strength; liberty is not an all-

or-nothing binary.  For example, a significant change in conditions of confinement can give rise

to a due process liberty interest even within the correctional context.  *See Wilkinson v. Austin*,

545 U.S. 209, 224 (2005) (holding that plaintiffs had a liberty interest in avoiding assignment to

a supermax prison); *Vitek v. Jones*, 445 U.S. 480, 493 (1980) ("[I]nvoluntary commitment to a

mental hospital is not within the range of conditions of confinement to which a prison sentence

subjects an individual.").  Where an inmate has been granted probation or parole, the individual

likewise has a protected liberty interest in maintaining that degree of liberty.  *See Morrissey v.

Brewer*, 408 U.S. 471, 482 (1972) ("Though the State properly subjects [a parolee] to many

restrictions not applicable to other citizens, his condition is very different from that of

confinement in a prison . . . . the liberty of a parolee, although indeterminate, includes many of

the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee

and often on others."); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) ("Probation revocation,

like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of

liberty.").  And an inmate who was erroneously released early can also acquire a liberty interest

---

[10] Although not directly analogous, multiple persuasive cases from the pretrial detention context have held that it is unconstitutional to keep pretrial detainees in jail solely because of a lack of space in treatment facilities. *See Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121–22 (9th Cir. 2003) (holding that a state hospital's failure to promptly evaluate and treat mentally ill pretrial defendants who remained detained in the meantime violated substantive due process); *Advoc. Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 605 (E.D. La. 2010) (granting a preliminary injunction to incompetent pretrial detainees required to complete inpatient treatment who instead remained in jail while awaiting a vacancy); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 943 (E.D. Ark. 2002) (holding in a § 1983 action that "lengthy and indefinite periods of incarceration… caused by the lack of space at [the state hospital], is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted….").

preventing spontaneous reincarceration.  *Hurd v. District of Columbia* ("*Hurd II*"[11]), 864 F.3d 671, 682–83 (D.C. Cir. 2017).  Tyson has alleged, and the District's submissions confirm, that following his sentence of incarceration Tyson was subject only to probation, with inpatient treatment as a condition of that probation.  2d Am. Compl. ¶¶ 22–24; Ex. 1 of Defs.' Mot.  That meaningfully different restriction on his liberty, taking into account its nature and purpose, plausibly supports a liberty interest that suffices to survive the motion to dismiss phase.

Next, the District disputes that failure to release Tyson "shock[ed] the conscience" as required for a violation of substantive due process.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  A government action or inaction may meet the shock-the-conscience test for substantive due process with the lower showing of "deliberate indifference" when "the State has a heightened obligation toward the individual."  *Fraternal Ord. of Police Dep't of Corr. Lab. Comm. v. Williams*, 375 F.3d 1141, 1145–46 (D.C. Cir. 2004).  The government's responsibility to prisoners in its custody is one such heightened obligation.  *Barnes*, 793 F. Supp. at 277 ("In the prison setting, where forethought about the welfare of inmates is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare, deliberate indifference can rise to a constitutionally shocking level . . . .") (cleaned up); *Smith v. District of Columbia*, 306 F. Supp. 3d 223, 245 (D.D.C. 2018) ("[A] showing of deliberate indifference can support a finding of a substantive due process violation in a 'normal custody' situation.") (cleaned up).

Whether deliberate indifference shocks the conscience is a fact-intensive inquiry that depends on the harm and the context.  In the prison context, the Supreme Court has suggested

---

[11] The Court adopts the numbering of the various *Hurd* decisions used in the briefing.  *See* Pl.'s Notice of Supp. Authority at 2–4, ECF No. 33.

that "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Cnty. of Sacramento*, 523 U.S. at 853; *see also Hurd II*, 864 F.3d at 687–88 (suggesting without deciding that "the arguably non-exigent circumstances involved in deciding whether or not a prisoner who was released early should be re-incarcerated years later" may "shock the conscience" and noting that in this area, "everything turns on the circumstances").  Tyson alleges that the District had multiple opportunities to prevent or mitigate his own overdetention, as well as a series of similar cases ranging from 2017 to 2021 that the District failed to take any action on.  2d Am. Compl. ¶¶ 25–31, 55–64.  The complaint also alleges that District officials failed to even email CSOSA until five days before his sentence expired despite knowing that CSOSA has a typical lag time of two or more weeks.  *Id.* ¶¶ 49–50. Taken as true, these allegations suggest both the "extended opportunities to do better" and the "protracted failure even to care" that can make indifference conscience-shocking.  *Cnty. of Sacramento*, 523 U.S. at 853.

### b.  Procedural Due Process

To show a violation of the constitutional right to procedural due process, a plaintiff must first "show that there was a cognizable liberty or property interest at stake."  *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 12 (D.D.C. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). The District argues again here that Tyson had no liberty interest at all.  *See* Defs.' Mot. at 18 ("Tyson's procedural due process rights were not violated because his liberty interests were not denied. Under Judge Demeo's Order, Tyson would still be supervised albeit by CSOSA rather than by the District.").  The Court again disagrees and finds that Tyson has adequately alleged a protected liberty interest in freedom from bodily restraint for the reasons discussed above.  *See supra* Section III.C.1.a.

Once a cognizable liberty or property interest is at stake, due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. 319, 333 (1976) (internal quotations omitted).  What process is due is flexible and determined by balancing "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

"For a procedural due process claim to survive a 12(b)(6) motion, a plaintiff must, at a minimum, 'identify the process that is due.'" *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 17 (D.D.C. 2020) (quoting *Doe v. District of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996)). Tyson alleges that he received no process at all, and he goes a step further by identifying at least one alternative that he proposes would have remedied his alleged overdetention from a procedural due process standpoint: notifying the sentencing judge that the sentencing order could not be carried out as written.  2d Am. Compl. ¶ 74; *see also* Pl. Opp'n at 34–35 (applying the *Mathews* test to this proposed process).

The District counters by arguing that there was a process available—the D.C. Jail's internal grievance process—and that "Tyson failed to avail himself of it."  Defs.' Mot. at 19; *see also* Ex. 3 of Defs.' Mot. (copy of grievance procedure and forms).  The grievance policy is a document from the Defendants' motion that is not referenced in the Complaint and upon which the Complaint does not rely—which is normally not considered at the motion to dismiss stage. *See Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) (holding that "the district court erred by relying on two documents outside the complaint as dispositive evidence" on a motion to

dismiss).  However, the District urges the Court to take judicial notice of the grievance procedure as a publicly available government document, *see* Defs.' Mot. at 19, n1.; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("[P]ublic records [are] subject to judicial notice on a motion to dismiss."), and Tyson does not dispute its authenticity, *see* Pl. Opp'n at 36 (discussing the substance of the policy).

Even considering the grievance policy pursuant to judicial notice, it does not undermine Tyson's alleged procedural due process claim.  Due process requires notice and an opportunity to be heard.  *Mathews*, 424 U.S. at 333.  The grievance policy offers neither, only the ability for Tyson to notify the DOC of his overdetention, have it investigated, and receive a written response.  *See* Ex. 3 of Defs.' Mot.  As a result, nothing about the existence or substance of the grievance policy contradicts Tyson's factual allegation that none of the defendants "provide[d] notice (to the committing judge, to Mr. Tyson, and to his attorney) and a hearing to Mr. Tyson when the Defendants decided to . . . hold him past his Release Date." 2d Am. Compl. ¶ 34.

Because Tyson has adequately alleged a protected liberty interest, it follows that he was owed at least some process with the elements of notice and a hearing, and the Court need not determine at this stage the exact timing and structure of what process was required.  *See Hurd II*, 864 F.3d at 682 (addressing only whether an erroneously released prisoner had established a liberty interest at the motion to dismiss stage because it was "undisputed that the District failed to provide Hurd with any prior notice or hearing").  Tyson has therefore stated a plausible claim for a predicate procedural due process violation.

### 2.  Policy or Custom

It is not enough that a plaintiff plead a constitutional violation, however.  They must also show an "affirmative link" between a municipal policy and the violation.  *Baker*, 326 F.3d at

1306.  There are four ways a plaintiff can demonstrate the existence of a municipal policy: (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  *Id.*  Counts 4 and 5 of Tyson's Second Amended Complaint argue that his overdetention was caused by either an explicit policy, a municipal custom, or deliberate indifference, each of which are addressed in turn.

### a. *Explicit Policy (*Baker *#1)*

To establish the existence of an explicit municipal policy requires showing that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.  The Second Amended Complaint identifies and quotes portions of one official policy document that Tyson believes caused his overdetention: DOC's Program Statement 4353.1C, which governs admission, transfers, and releases of inmates in the District's custody.  2d Am. Compl. ¶¶ 103–07.  As Tyson explains, "[t]he Program Statement does not have a provision instructing DOC staff to take any action when the DOC is required to release an inmate into the custody of an outside agency such as CSOSA and the agency does not come to pick them up by the Release Date," and his theory is that this silence "default instructs the DOC staff to maintain the status quo by continuing to hold the inmate."  2d Am. Compl. ¶ 107.

The District disagrees that any silence in Program Statement 4353.1C can be considered an "explicit policy" that was a moving force for the violation, and on this point the Court agrees.

The lack of instruction in the Program Statement and how the District's employees have interpreted that silence may be relevant to the subsequent *Baker* tests, but it does not create an explicit policy for purposes of the first test.[12]  Tyson has therefore failed to allege the existence of an explicit policy under the first *Baker* method.[13]  *See Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (determining a plaintiff's allegations about the behavior of District employees "may be relevant to the last three of the four Baker tests, but they are irrelevant to whether the District has set an 'explicit' policy that violates the Constitution").

In his Notice of Supplemental Authority, Tyson urges the Court to treat the D.C. Circuit's recent decision in *Hurd v. District of Columbia* ("*Hurd IV*"), which determined that the same Program Statement at issue in this case may have been unconstitutional as applied to that plaintiff, as controlling on this point.  Pl.'s Notice of Supp. Authority at 1, ECF No. 33.  The plaintiff in *Hurd IV* was reincarcerated on a previous offense for which he had been erroneously released while serving a weekend-only sentence on a different charge years later.  *Hurd v. District of Columbia* ("*Hurd IV*"), 997 F.3d 332 (D.C. Cir. 2021)).  For its part, the District's response is that it "had lawful authority to detain Tyson until his transfer to CSOSA" and that Tyson was detained under the authority of Judge Demeo's order rather than the Program Statement.  Defs.' Resp. Supp. Authority at 1–2, ECF No. 35.

---

[12] Indeed, the portion of the Program Statement stating that "[i]t is DOC Policy to . . . [e]nsure inmates are appropriately released at the end of their term," Program Statement 4353.1C(2)(c), could also be fairly read to require the exact kinds of actions Tyson proposes were missing. *Cf. Givens v. Bowser*, No. 20-cv-307, 2021 WL 3507881, at *7 (D.D.C. May 3, 2021) (rejecting an explicit policy claim where the alleged violation "occurred as a result of an admitted failure to follow the District's official policy").

[13] Tyson also alleges that "it is not known if there is some additional policy," but the facts he offers in support of this claim are again more applicable to the custom and deliberate indifference prongs of Baker. 2d Am. Compl. ¶ 108.  Bare speculation that another explicit policy may exist is insufficient to survive the plausibility standard. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

Although *Hurd IV* examines the same Program Statement as a potential "explicit policy" that could give rise to municipal liability, the relevance of the Program Statement to these two plaintiffs differs.  There were disputed allegations in *Hurd IV* that the Program Statement did provide guidelines to that plaintiff's situation, namely by requiring officials to "review[] the records of inmates prior to their release to identify any basis for additional incarceration."  *Hurd IV*, 997 F.3d at 340–41.  Because the officials followed that exact procedure and refused to release Hurd after finding an outstanding basis for additional incarceration, it follows that the Program Statement may well have been the moving force behind the alleged constitutional violation.  *Id.* at 342.  But Tyson does not allege that any particular step in the Program Statement led to his overdetention; instead he argues that the lack of instruction in the Program Statement about what to do when a third party fails to pick up an inmate is in itself a default instruction.  2d Am. Compl. ¶ 107.  Those two allegations are simply not the same, making *Hurd IV* inapposite to Tyson's complaint for the purposes of the first *Baker* test.

### b.  Existence of a Municipal Custom (*Baker #3*)

To show adoption of a municipal custom as described in the third *Baker* test, a plaintiff must show "a persistent, pervasive practice of the city officials . . . , which although not officially adopted, was so common and settled as to be considered a custom or policy."  *Coleman*, 828 F. Supp. 2d at 92 (quoting *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986)).  This test generally requires a plaintiff to include in a complaint "specific incidents that plausibly show a custom or pattern of behavior."  *Wells v. Hense*, 235 F. Supp. 3d 1, 12 (D.D.C. 2017) (quoting *Patrick v. District of Columbia*, 179 F. Supp. 3d 82, 87 (D.D.C. 2016)).  Pleadings that point to other specific incidents provide the "factual heft" to corroborate the alleged custom and bolster the plausibility of the complaint.  *See Trimble v. District of Columbia*, 779 F.Supp.2d 54,

59 (D.D.C. 2011) ("[M]erely speculating that an . . . uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under § 1983.").

Tyson's Second Amended Complaint provides significantly more factual allegations to bolster his theory that the District has a custom of continuing to detain inmates when a third party fails to take custody of them.  2d Am. Compl. ¶¶ 54–67.  He provides detailed allegations regarding Felicia Lewis, who recently remained detained an additional 16 days past her sentence while awaiting a transfer to CSOSA custody for treatment in the RSC, based on a sentencing order similar to Tyson's.  *Id.* ¶¶ 39–45.  In addition to Ms. Lewis, Tyson alleges cases of four more unnamed individuals who were held past their sentence for multiple days or weeks while awaiting transfer to CSOSA and RSC specifically, dating back to November 2017.  *Id.* ¶¶ 60–64.  Finally, the Second Amended Complaint includes allegations that local criminal defense attorneys are familiar with a several-week lag time for placement in RSC and report having "about two such cases per year per attorney."  *Id.* ¶ 56.  These closely related examples are enough to move Tyson's allegations out of the realm of speculation and plausibly allege a pattern of behavior on the part of District employees.[14]

The District argues in conclusory fashion that those "general descriptions . . . are not enough to show a pattern."  Defs.' Mot. at 16.  But general allegations can be sufficient so long as they are both factual and plausible.  *See Warren v. District of Columbia*, 353 F.3d 36, 40 (2004) (accepting as true the factual allegation that "they stuck the same needles in everybody's

---

[14] Tyson also included several examples of individuals who were held by the District past their sentence for other reasons such as pickup by the U.S. Marshals and delays in receiving parole documents, and the District focuses most of its argument on pointing out the dissimilarities of those cases.  Defs.' Mot. at 16.  The Court agrees that the existence of those other examples would not be sufficient to state a claim on their own but notes that they do not undermine Tyson's primary allegations, either.  In short, any support the non-CSOSA overdetentions provide to Tyson's claim is modest at best and does not impact the outcome of the Court's decision on this point.

arms" as evidence of a custom); *see also Wells v. Hense*, 235 F. Supp. 3d at 12 (favorably citing

that example from *Warren* even after the heightened standard of *Twombly* and *Iqbal*); *Patrick v.*

*District of Columbia*, 179 F. Supp. 3d at 87 (same).   Nor is there any kind of strict numerical

requirement on the number of other examples that must be alleged, rather, the level of

corroboration needed depends on the context and similarity.   *See Carter v. District of Columbia*,

795 F.2d 116, 124 (D.C. Cir. 1986) ("We do not mean to suggest . . . that a numerical standard

controls the determination whether incidents of wrongful behavior cumulatively show a pattern

amounting to a custom or policy.").

Tyson further supports his theory that there was a settled municipal custom of continuing

to detain inmates when third parties did not pick them up by pointing out the "business-as-usual"

attitude of the multiple District employees who knew of his overdetention both before and during

its occurrence.   2d. Am. Compl. ¶ 68; Pl. Opp'n at 24–25.   The District does not meaningfully

object to this characterization[15] and indeed even bolsters it with its continued litigation position

that the District was required to hold Tyson until CSOSA picked him up.   *See* Mem. Op. at 13,

n.6 ("The District's defense to the substantive allegations appears to be that CSOSA was

responsible for the entire incident . . . ."); *see also* Defs.' Mot. at 15 ("[T]he District does not

attempt to merely shift or blame others; the responsibilities about which Tyson claims belong to

the federal government, not the District."); Defs.' Reply at 3 (arguing that the release

requirements in the D.C. Code did not apply to Tyson because he "had not completed his

sentence; he was to be supervised by CSOSA, which bears the legal duty to pick Tyson up.").

Although the cavalier attitude of Myrick and the other District employees is not enough on its

---

[15] The District's only response is that it cannot be held liable under a respondeat superior theory. Defs.'
Reply at 7.  However, using the open nature of an employee's actions as circumstantial and supporting evidence of a
municipal custom is not the same as holding the municipality liable for those actions in a purely supervisory
capacity.

own to make the existence of a custom plausible, it serves to strengthen the plausibility of the

new facts Tyson has added to the Second Amended Complaint.  *Cf. Hurd IV*, 997 F.3d at 341 &

n.2 (discussing the various reactions of District officials and the District's litigation position to

"underscore the unresolved factual questions in this case bearing on the nature of the policy");

*Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) ("Cover-up efforts at

relatively low levels . . . suggest a belief by the subordinates that their behavior violates

established policy.").

In addition to the existence of a custom, a plaintiff attempting to establish liability

through the third *Baker* test must establish that the custom was so widespread that "the

supervising policymaker must have been aware."  *Hurd IV*, 997 F3d at 337 (paraphrasing the

third test of *Baker*, 326 F.3d at 1306).  Put another way, the custom must have been "so

engrained that it amounted to a 'standard operating procedure' of which municipal

policymakers[16] must have been aware."  *Id.* at 338 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491

U.S. 701, 737 (1989)).  This inquiry necessarily overlaps with the fourth *Baker* test, deliberate

indifference, but the District does not argue under either test that it lacked knowledge of the

problem.  Instead, it attacks only the similarity of the other alleged examples and continues to

argue that it in fact did nothing wrong.  *See* Defs.' Mot. at 16–17 ("Tyson has not shown a

pattern of similar constitutional violations committed by the District or what the District was

required to do but did not."); Defs.' Resp. Supp. Authority at 3 ("[T]he cases relied on by Tyson

---

[16] The parties debate whether Myrick was a final policymaker, an issue that is largely academic given that
Tyson does not assert a claim under the second *Baker* test: deliberate action of a policymaker.  *See* Defs.' Mot. at 14.
The Court need not resolve that issue here because the focus in the third *Baker* test is whether the custom was so
widespread that a final policymaker—whoever that may be—can be presumed to have been aware of it.  *Hurd IV*,
997 F.3d at 338 (explaining that a custom "can only confer liability on the municipality if the custom was so
engrained that it amounted to a 'standard operating procedure' of which municipal policymakers *must have been
aware*") (emphasis added).

to support municipal liability bear little resemblance to the type of unconstitutional conduct he asserts or because they occurred after his alleged wrongful detention.").

At this early stage, Tyson has alleged sufficient factual material to suggest that the custom was indeed so widespread as to be considered a "standard operating procedure" of which District policymakers must have been aware. *See, e.g.*, 2d Am. Compl. ¶ 57 ("[D]ozens if not hundreds of defendants each year are overdetained due to these delays; and there is always some lag in placement."), ¶ 65 ("One CJA lawyer described as 'fairly common' the situation where a defendant is overdetained . . . simply waiting on space in the RSC to open up."), ¶ 66 ("Another CJA lawyer reported that each year he sees at least two clients overdetained in the DC Jail while waiting for CSOSA to come pick up the defendants."), ¶ 67 ("On information and belief the DOC has never informed a Superior Court judge of the overdetentions and requested a hearing for a defendant being overdetained.").

Such allegations stand in marked contrast to the unsuccessful allegations in *Page v. Mancuso*, which the District cites. Defs.' Mot. at 17. The plaintiff in *Page* did not allege that "D.C. jail officials subjected any *other* individuals to strip searches in the absence of reasonable suspicion," or even that "the D.C. jail had been conducting these strip searches on a regular basis." *Page v. Mancuso*, 999 F. Supp. 2d 269, 285 (D.D.C. 2013). As explained above, Tyson has alleged that the DOC overdetained individuals awaiting a CSOSA pick up on a regular basis and gives five highly analogous examples in addition to his own. Those allegations, especially when accompanied by the District's own characterization of Tyson's overdetention, are plausible enough and specific enough to state a claim that a widespread municipal custom existed.

Moreover, Tyson has adequately alleged an affirmative link between the custom identified and his own alleged overdetention. The District attempts to dispute this link by

brushing aside any examples of overdetention that occurred after Tyson's own, including the highly detailed and specific example of Ms. Lewis in 2021, as irrelevant because "any overdetentioned [sic] inmate after May 2019 . . . could not have led to Tyson's overdetention." Defs.' Mot. At 16.  The District misunderstands the role of examples in establishing a custom. Incidents such as that of Ms. Lewis serve as examples that, taken together, create a pattern and allow for a reasonable inference that a custom exists.  It is the custom, not the examples, that must be the moving force behind the constitutional violation.  *See Baker*, 326 F.3d at 1306 (requiring an "affirmative link" between the custom and the violation).  Therefore, examples that occur after the specific incident in the case at hand can still be relevant evidence of an ongoing custom.[17]  *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

It is more than plausible that if a custom of continuing to detain inmates past their sentences when a third party like CSOSA fails to pick them up on time does in fact exist—as Tyson has alleged it does—that that custom was the reason Tyson was overdetained.  The District supplies no alternative reason that it continued to detain Tyson, and none appears on the face of the complaint.  Nor does the District argue that Tyson's overdetention was an isolated mistake.  Thus, the Court draws this reasonable inference in Tyson's favor and concludes that he has adequately stated a claim for municipal liability under the third *Baker* test.  *See Owens v. BNP Paribas*, S.A., 897 F.3d 266, 272 (D.C. Cir. 2018) ("In determining a complaint's plausibility, we . . . draw all reasonable inferences in favor of the plaintiffs.").

---

[17] The timing of any examples after the violation at issue are more relevant to evaluating a deliberate indifference claim under the fourth *Baker* test.  But even applying the District's argument to that test, the Court notes that at least three, and potentially four or five, of the highly similar incidents did occur before Tyson's overdetention.  2d Am. Compl. ¶¶ 60–64.

### c.  Deliberate Indifference (Baker #4)

Deliberate indifference is an objective standard that means that when a city is "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren*, 353 F.3d at 39.  It is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

To evaluate whether a city was deliberately indifferent to a pattern of misconduct, the plaintiff must first have articulated "a specific form of misconduct" at issue. *Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 265 (D.D.C. 2010).  The Court has no difficulty determining that Tyson has done so: the alleged misconduct of detaining individuals after their release dates if a third party such as CSOSA does not pick them up on time.[18]  *Cf. id.* (the allegation that the police department "encourage[d] and permit[ted] officers on patrol in their vehicles to intimidate young motorcyclists, intentionally, using means including but not limited to swerving into motorcyclists' lane of traffic causing the rider to swerve, fall or lose control of the motorcycle" was a specific form of misconduct).

The more difficult step of establishing deliberate indifference is whether the city was or should have been "on notice" that constitutional violations were likely to occur.  *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).  Where a plaintiff is alleging

---

[18] The District's primary defense to this claim is that there was no deliberate indifference to the risk of Tyson's overdetention because "DOC affirmatively contacted CSOSA twice before Tyson's eligible transfer date to have Tyson picked up for transfer to RSC."  Defs.' Mot. at 12; see also Defs.' Resp. Supp. Authority at 4.  But deliberate indifference is an objective standard that need not involve any ill-will or malice.  *Warren*, 353 F.3d at 39. The fact that officials sent three emails notifying CSOSA around the time of Tyson's sentence expiration is therefore not inconsistent with deliberate indifference to what would happen when CSOSA failed to respond to those emails. And it is the pattern of inaction when CSOSA failed to respond, not the failure to notify CSOSA, that Tyson alleges violated his constitutional rights.

deliberate indifference based on a city's failure to respond to a pattern of misconduct, as Tyson is here, that analysis overlaps with the consideration of whether policymakers knowingly ignored a custom under the third *Baker* test. *See Hurd IV*, 997 F.3d at 337 (addressing the third and fourth *Baker* tests together where the alleged misconduct "was part and parcel of a pattern of similar violations") (internal quotations omitted); *Alexander v. Gov't of the Dist. of Columbia*, No. 17-cv-1885 at 23 (D.D.C. July 1, 2020) ("[T]here is significant overlap in the allegations supporting municipal liability under the third and fourth *Baker* prongs.").

Tyson's complaint now provides the "number, nature, and timing" of other instances of misconduct as needed to establish a pattern. *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 159 (D.D.C. 2015). But in order to show deliberate indifference to a pattern, "the other asserted violations must have materially similar legal implications so as to put the municipality on notice of the probability of future constitutional violations." *Hurd IV*, at 340. Of the specific instances Tyson points to, only three—arguably four or five—satisfy both the requirements of preceding the constitutional violation at issue and having sufficiently similar legal implications. 2d Am. Compl. ¶¶ 55a, 60–63. Nor does the complaint allege that any kind of formal complaint or liability arose from these previous incidents. *Cf. Pollard v. District of Columbia*, 698 F. App'x 616, 621 (D.C. Cir. 2017) ("The District cannot be deliberately indifferent to an allegedly injurious practice of which the Appellants fail to allege the District had any knowledge."); *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 212–13 (D.D.C. 2009) (dismissing a claim where there were no allegations that the complaints about the treatment at issue ever reached the District).

The Court therefore acknowledges that, under the slightly narrower inquiry of whether this pattern put the city on notice of potential violations for the purpose of deliberate

indifference, this is a closer call.  But as was the case under the third *Baker* test, Tyson's additional allegations about reports from criminal defense attorneys and the cavalier attitude of the various records officials bolster the plausibility of the specific examples he provides.  It is at least plausible, given the specific allegations and circumstantial evidence of a widespread pattern, that the District "'knew or should have known of the risk of constitutional violations,' but did not act."  *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011) (quoting *Baker*, 326 F.3d at 1306).  In short, the procedural posture of this motion is dispositive: because it is a motion to dismiss, the Court must "draw all reasonable inferences in favor of the plaintiffs."  *Owens v. BNP Paribas*, S.A., 897 F.3d at 272.  Another court in this district recently allowed the "somewhat conclusory" allegations regarding the fourth *Baker* test to proceed past the motion to dismiss stage where the claim under the third test "was going forward anyway, and . . . discovery on the two theories will be largely the same."  *Alexander*, No. 17-cv-1885 at 26 (D.D.C. July 1, 2020).  Because Tyson's § 1983 claim may proceed under the third *Baker* test anyhow, and discovery under the two tests will largely overlap, the same considerations apply here.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint, or in the Alternative Reconsider, is denied.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: October 19, 2021                                    RUDOLPH CONTRERAS
                                                           United States District Judge